**Opinion issued February 20, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00079-CV

_____

**DEREK GASKAMP, JONATHAN MILLER, AND ANDREW HUNTER,**
**Appellants**

**V.**

**WSP USA, INC., WSP USA BUILDINGS, INC. AND WSP USA**
**ADMINISTRATION, INC., Appellees**

---

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2017-66686

---

## OPINION ON EN BANC RECONSIDERATION

Derek Gaskamp, Jonathan Miller, and Andrew Hunter have filed a motion for

en banc reconsideration of this Court's December 20, 2018 opinion and judgment.

*See* TEX. R. APP. P. 49.7. The Court grants en banc reconsideration. *See* TEX. R. APP.

P. 41.2, 49.7. We withdraw our opinion and judgment of December 20, 2018, and we substitute this opinion and judgment in their stead.

WSP USA Administration, Inc. ("WSP Administration"), WSP USA Buildings, Inc. ("WSP Buildings"), and WSP USA, Inc. (collectively, "WSP") sued former employees Derek Gaskamp, Jonathan Miller, and Andrew Hunter for conduct related to their alleged misappropriation of WSP's trade secrets and confidential information. Gaskamp, Miller, and Hunter filed a motion to dismiss WSP's claims pursuant to the Texas Citizens' Participation Act ("TCPA").[1] The trial court denied the motion, and Gaskamp, Miller, and Hunter filed this interlocutory appeal, raising three issues challenging the trial court's denial.[2]

We affirm.

---

[1] As discussed more fully later in the opinion, the Texas Legislature amended certain provisions of the TCPA in 2019. Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–9, § 12, secs. 27.001, 27.003, 27.005–.007, 27.0075, 27.009–.010, Tex. Sess. Law Serv. 684, 687. The amendments became effective September 1, 2019. *Id.* at §§ 11–12. Because this suit was filed before the effective date of the amendments, this case is governed by the statute as it existed before the amendments. *See id.* All our citations are to the TCPA as it existed prior to September 1, 2019, unless otherwise stated. For ease of reference, citation to the pre-amendment version of a section amended in 2019 will be identified as the "Former" section.

[2] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12) (authorizing interlocutory appeal of order denying motion to dismiss filed under TCPA Section 27.003).

## Background

In early October 2017, WSP filed suit against Infinity MEP, a limited liability company, and against WSP's former employees, Derek Gaskamp, Jonathan Miller, Andrew Hunter, and David Sinz.[3] A week later, WSP filed its First Amended Petition. The amended petition described WSP as "a leader in civil engineering, fire protection and risk, bridge engineering, analysis and strategy, construction design, environment and sustainability, and . . . electrical, IT, telecommunications, automation, and HVAC systems[.]" The petition averred that WSP had "developed several sophisticated, challenging, and substantial projects for clients that include hospitals, universities, corporations, hotels, and other large-scale commercial and residential facilities."

The petition alleged that David Sinz had been an office manager for one of WSP's Houston offices. Sinz's duties included "developing business, contacts, and opportunities for WSP" and "delegat[ing] the work to engineers in the office." Sinz resigned from WSP in late April 2017. WSP stated that, a couple weeks before his resignation, Sinz founded Infinity MEP, a business providing "mechanical, electrical, plumbing, fire protection, commissioning, and low voltage/security/IT services." WSP averred that these "are the very same services provided by WSP."

---

[3] Infinity MEP and Sinz are not parties to this appeal.

After Sinz's resignation, Gaskamp, Miller, and Hunter also resigned from WSP. They joined Sinz at Infinity. WSP stated that "Sinz is the managing member and president of Infinity MEP, Gaskamp is the associate principal of Infinity MEP, and Miller is the principal of Infinity MEP. Hunter is an Infinity MEP employee."

After the employees resigned, WSP learned that Infinity's website identified 14 different "featured projects," which Infinity represented were "from [Infinity] staffs' previous career at WSP and other firms." By posting the information on its website, WSP alleged that Infinity was "attempting to leverage WSP's successful projects and WSP's association with high-profile clients—without WSP's consent—into business opportunities, relationships, and contracts of its own."

WSP then conducted an "an internal investigation and a forensic analysis" of the hard drives on Sinz's, Gaskamp's, Miller's, and Hunter's computers "to determine whether . . . they had taken any trade secret, confidential, or proprietary information." WSP claimed that the analysis revealed that "seven USB devices were plugged into Sinz's WSP-issued computer between January and April 2017, none of which were WSP-issued devices." WSP noted that the last USB device had been connected to Sinz's hard drive after Sinz had registered Infinity with the Texas Secretary of State.

The investigation revealed that, the afternoon before he had resigned, Sinz had accessed a folder on the computer titled "Potential Projects." The folder

4

contained "files, data, and information regarding projects and customers that WSP is actively pursuing." WSP claimed that "Sinz was retrieving information about prospective customers—without WSP's consent—in order to use it to Infinity, Sinz, Gaskamp, Miller, and Hunter's advantage and in unfair competition with WSP."

WSP stated that its forensic analysis also revealed that, not long before he resigned, Sinz had opened 14 different "project files for projects long-since completed or otherwise inactive and, for most of them, projects with which Sinz had no involvement." WSP claimed that "[t]he folders include customer information, pricing data, and the project Revit files, among other data and information." WSP explained that "Revit is an electronic design software that WSP uses to create architectural designs embellished with its proprietary mechanical, electrical, and plumbing standard details, and any other project requirements per customer specifications."

WSP averred that "the Revit file for each project incorporates WSP's proprietary approach to these services that make it a leader in the field." WSP claimed that was the reason it "protects its Revit files as trade secret, proprietary, and confidential information." It asserted that "unauthorized access to and use of Revit files allows competitors to capitalize on WSP's cache of expertise as competitors can use WSP's Revit data to create as-built drawings and renderings for

5

customers, without the burden of time, expenses, and technical knowhow or experience."

WSP also alleged that Sinz had posted information to Infinity's website to demonstrate Infinity's qualifications "to engage in work identical to that comprising the core of WSP's business." WSP asserted that "Sinz also accessed files relating to projects between WSP and its current and potential clients . . . including confidential and proprietary data relating to those projects." WSP claimed that "Sinz also publicly used the information to his, Gaskamp, Miller, Hunter, and Infinity MEP's benefit, advertising the projects as evidence of Infinity's 'experience' and ostensibly to attract clients."

WSP further alleged that its internal investigation "showed [the former employees] engaged in off-book projects with WSP resources, in contravention of their fiduciary duties to WSP and the ethical rules applicable to professional engineers." WSP asserted that the "internal investigation also determined that Sinz, Gaskamp, Miller, and Hunter ha[d] interfered with WSP's current contractual relations and have stolen funds from WSP."

Based on its factual allegations, WSP asserted common law and statutory causes of action against the four former employees, including a claim based on the Texas Uniform Trade Secrets Act ("TUTSA").[4] WSP maintained that the former

---

[4] *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.001–.008.

6

employees violated TUTSA by using and disclosing WSP's "valuable trade secret, proprietary, and confidential information in competition with WSP" for the former employees' "own financial gain at Infinity MEP." WSP also claimed that former employees had violated the Texas Uniform Fraudulent Transfer Act ("TUFTA").[5] And WSP alleged that the former employees had fraudulently transferred WSP's trade secret, proprietary, and confidential information to Infinity.

In addition, WSP asserted common-law causes of action against the former employees and against Infinity. Against the former employees, WSP brought claims for breach of loyalty, breach of fiduciary duty, tortious interference with existing contracts and prospective business relations, unjust enrichment, unfair competition, and civil conspiracy.

WSP claimed that the former employees had breached their duty of loyalty "by purposefully obtaining, disclosing, and using the trade secret, proprietary, and confidential information of WSP to establish a competing engineering firm, all while still employed by WSP[.]" WSP asserted that the former employees had breached their fiduciary duties by using and disclosing WSP's confidential and trade secret information to their benefit and to WSP's detriment. With respect to tortious interference with existing contracts, WSP alleged that the former employees had

---

[5]    *See* TEX. BUS. & COM. CODE §§ 24.001–.013.

7

"induced" parties with whom WSP had contracts "to reduce" their business with WSP. WSP also alleged that the former employees' "taking, sharing, and use of WSP's confidential, proprietary, and trade secret information has enabled [the former employees] to purposefully interfere with these prospective contracts and business relationships." WSP further claimed that the former employees' improper conduct had unjustly enriched them and constituted unfair competition.

To support its civil conspiracy claim, WSP alleged that the former employees had "act[ed] in collusion" (1) to "misappropriate WSP's trade secrets, proprietary, and confidential information;" (2) to "fraudulently transfer assets and WSP's trade secrets, proprietary, and confidential information"; (3) to "tortiously interfere with WSP's existing contracts and prospective business relationships;" and (4) "to engage in unfair competition with WSP." WSP also alleged that the former employees had "associated together through a meeting of their minds and for a common purpose of engaging in a course of conduct, and as an ongoing and continuing organization or unit, to conduct the unlawful and tortious conduct[.]" WSP alleged that the former employees had

> secretly conspired among themselves, and possibly with others currently unknown to WSP, to devise and implement wrongful and unlawful schemes to misappropriate WSP's trade secrets, proprietary, and confidential information, fraudulently transfer WSP assets and trade secrets, proprietary, and confidential information, engage in unfair competition, and tortiously interfere with WSP's existing contracts and prospective business relationships.

8

WSP requested actual and exemplary damages as well as attorneys' fees. WSP also sought injunctive relief to restrain Infinity and the former employees from using, transferring, and disclosing WSP's trade secret, confidential, and proprietary information.

The former employees answered the suit, denying WSP's claims and asserting affirmative defenses and counterclaims, alleging that WSP filed its misappropriation claims in bad faith. Gaskamp, Miller, and Hunter (but not Sinz or Infinity) filed a motion to dismiss the suit pursuant to the TCPA. They asserted, "While framed as a case to protect confidential information and trade secrets, [WSP's] lawsuit is little more than an attempt to stifle competition and impede the growth of a new competitor some six months after its formation."

Citing the TCPA, Gaskamp, Miller, and Hunter claimed that WSP's suit should be dismissed because it is a "legal action . . . based on [their] exercise of the right of free association." They also asserted that WSP's claims were based on their "exercise of the right to free speech." Gaskamp, Miller, and Hunter further claimed that WSP could not "establish by clear and specific evidence each element of their claims" against them. They requested the trial court to dismiss the suit and to award them the statutorily required attorneys' fees, costs, and sanctions.

A few days later, two of the WSP entities—WSP Buildings and WSP Administration—filed a Second Amended Petition. The Second Amended Petition differed from the First Amended Petition in several ways.

The Second Amended Petition omitted WSP USA as a plaintiff. A footnote in the petition stated, "WSP's Second Amended Petition nonsuit[s] Plaintiff, WSP USA, Inc." It also averred that WSP Buildings, not WSP Administration, owns the trademark, confidential, and proprietary information that is the subject of the litigation. Concomitant with this ownership, only WSP Buildings (but not WSP Administration) asserted causes of action dependent on ownership. The petition stated that WSP Administration was the WSP entity that had employed Sinz, Gaskamp, Miller, and Hunter. WSP Administration dropped six of the causes of action it had asserted but continues to assert claims for unjust enrichment, breach of loyalty, and breach of fiduciary duty.

The Second Amended Petition added detailed allegations, averring that WSP's forensic analyses of the former employees' computers had not only indicated that Sinz had accessed and removed WSP Buildings's trade secret and confidential information before his resignation but so had Gaskamp, Miller, and Hunter.

The Second Amended Petition also indicated that WSP took steps to protect its trade secret and confidential information. The petition alleged,

> WSP Buildings does not disclose or disseminate its Revit models in native format, which would include the metadata for the algorithms,

10

formulas, and other tools embedded in the file. Rather, in order to allow the architect to utilize the models, WSP Buildings only provides a PDF of the design, which includes only that information that is necessary (and not trade secret or confidential) to allow the architect and other subcontractors to design and build the structure.

The Second Amended Petition further provided details about an "off-books" project called "ME Global." The petition alleged that WSP learned that Sinz, Gaskamp, Miller, and Hunter, while still employed by WSP Administration, bid on the ME Global project without WSP's knowledge by sending a proposal to the prospective client, Kirksey Architecture. In making the bid, they represented themselves as WSP employees who were making the bid on behalf of WSP. Kirksey ostensibly awarded ME Global to WSP, however, the four employees never informed WSP about the project, keeping it "off the books."

WSP Administration and WSP Buildings alleged that Sinz, Gaskamp, Miller, and Hunter worked on the ME Global project using WSP resources, including WSP Buildings's trade secret and confidential information, but never informed WSP of the project or recorded WSP's resources used on the project. Ultimately, Kirksey paid WSP Buildings for work completed at "the 10% milestone" on the project. However, WSP was then informed that another firm would be completing the project. WSP Administration and WSP Buildings alleged that they received information indicating that Sinz, Gaskamp, Miller, and Hunter continued to work on the project after they left WSP and began to work for Infinity.

11

WSP Administration and WSP Buildings also alleged that the former employees and Infinity interfered with its current and prospective contractual relationships by sending advertising brochures to WSP Buildings clients. WSP Buildings claimed that, after receiving the advertising brochures, its clients began to ask whether the rumor was true that WSP's Houston's office was closing.

The Second Amended Petition was verified by Mike Brueggerhoff, as "Vice President Operations Manager—Houston" for WSP Buildings.[6] He attested that he had read the Second Amended Petition and that "the contents thereof are based on my personal knowledge and are true and correct."

The same day that the Second Amended Petition was filed, WSP Buildings and WSP Administration also filed a response to Gaskamp, Miller, and Hunter's TCPA motion to dismiss. WSP USA, Inc.—which had effectively nonsuited its claims after the motion was filed by not joining in the Second Amended Petition— did not file a response to the motion. To support their response, WSP Administration and WSP Buildings relied on the allegations in their Second Amended Petition.

In their response, WSP Buildings and WSP Administration offered four arguments regarding why the TCPA motion to dismiss should be denied. First, they asserted that the motion to dismiss was moot because the motion was based on WSP's First Amended Petition, which had been superseded by the filing of the

---

[6] Brueggerhoff had also verified WSP's First Amended Petition.

Second Amended Petition. Second, they claimed that the motion should be denied because their lawsuit was not based on Gaskamp's, Miller's, and Hunter's exercise of their rights to freely associate or their rights of free speech as required under the TCPA. Instead, they asserted that the suit was based on the alleged theft and use of WSP's trade secrets. Third, the they asserted that the TCPA's commercial-speech exemption applied to WSP's claims. Finally, they claimed that the TCPA motion to dismiss should be denied because they offered "clear and specific evidence to present a prima facie showing as to each element of their claims."

The trial court denied Gaskamp, Miller, and Hunter's TCPA motion to dismiss. The trial court's order did not specify the reason for the denial other than stating that the motion was "*not* meritorious." Gaskamp, Miller, and Hunter ("Appellants" hereinafter) now appeal the trial court's order denying their TCPA motion to dismiss.

## Motion to Dismiss Not Moot

As a threshold matter, we first address WSP's contention in their brief that "Appellants' motion to dismiss—premised on WSP's First Amended Petition—was mooted by WSP's subsequently filed Second Amended Petition." WSP asserts, "By filing a Second Amended Petition after Appellants filed their dismissal motion, WSP removed its First Amended Petition from the record and destroyed the sole basis of Appellants' motion, precluding TCPA dismissal."

13

WSP avers, "[T]his procedural maneuver [WSP's amending of the petition] is not dissimilar to those used to avoid dismissal under Rule [of Civil Procedure] 91a or to avoid summary judgment under Rule 166a." *See* TEX. R. CIV. P. 91a (providing procedure for dismissal of cause of action with no basis in law or fact); TEX. R. CIV. P. 166a. They assert that, "[u]nder those frameworks, after a Rule 91a or 166a motion is filed, a plaintiff may amend its petition to replead, nonsuit, or add claims, thereby avoiding dismissal or summary judgment." WSP claims that "[t]he necessary result of this procedural maneuver is not outlined by Rules 91a or 166a but, rather, is required by Rules 63 and 65." *See* TEX. R. CIV. P. 63 (providing that parties may amend their pleadings within seven days of trial date without leave of court); TEX. R. CIV. P. 65 (stating that, once substituted pleading filed, previous pleading "shall no longer be regarded as a part of the pleading in the record of the cause").

Contrary to WSP's assertion, Rule 91a does, in fact, address the effect of a nonsuit or amendment of a petition, providing that, in response to a Rule 91a motion, a plaintiff may nonsuit the challenged cause of action or amend it. *See* TEX. R. CIV. P. 91a.5(a), (b). Under Rule 91a.5, a court may not rule on a motion to dismiss if the plaintiff has, at least three days before the hearing on the motion to dismiss, nonsuited the challenged cause of action. *See* TEX. R. CIV. P. 91a.5(a). If the plaintiff "amends the challenged cause of action at least 3 days before the date of the hearing,

14

the movant may, before the date of the hearing, file a withdrawal of the motion or an amended motion directed to the amended cause of action." *See* TEX. R. CIV. P. 91a.5(b). The rule further provides, "Except by agreement of the parties, the court must rule on a motion unless it has been withdrawn or the cause of action has been nonsuited in accordance with (a) or (b). In ruling on the motion, the court must not consider a nonsuit or amendment not filed as permitted by paragraphs (a) or (b)." TEX. R. CIV. P. 91a(c). Unlike the TCPA, Rule 91a expressly addresses the filing of a nonsuit and the amendment of pleadings in the context of a motion to dismiss under that rule. Thus, Rule 91a is not instructive on WSP's assertion that the TCPA motion to dismiss was mooted by the filing of the Second Amended Petition.

The law governing summary-judgment practice is also not instructive. While a motion to dismiss under the TCPA constitutes a claim for affirmative relief, a motion for summary judgment does not. *The Iola Barker v. Hurst*, No. 01-17-00838-CV, 2018 WL 3059795, at *5 (Tex. App.—Houston [1st Dist.] June 21, 2018, no pet.) (mem. op.) (holding that TCPA motion to dismiss, seeking dismissal with prejudice and attorney's fees, costs, and sanctions, constituted "pending claim for affirmative relief"); *Young v. Villegas*, 231 S.W.3d 1, 6 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding motion for summary judgment is not claim for affirmative relief).

Here, the TCPA dismissal motion's status as a claim for affirmative relief is determinative of whether the motion became "moot" when the Second Amended Petition was filed as WSP claims.

As mentioned, WSP USA, WSP Buildings, and WSP Administration were the plaintiffs in the First Amended Petition. Each asserted the same nine causes of against Appellants in that pleading. Appellants then filed their TCPA motion to dismiss based on the First Amended Petition. They requested (1) dismissal of all WSP's claims, (2) attorneys' fees, and (3) sanctions. A few days later, WSP Buildings and WSP Administration filed the Second Amended Petition. The Second Amended Petition indicated that WSP USA's claims were nonsuited. Thus, WSP USA was no longer a plaintiff. *See Fraud–Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 375 (Tex. App.—Fort Worth 2003, pet. denied) (recognizing general rule that parties to suit, including plaintiffs, are dismissed from suit by omitting their names from amended pleading).

WSP Buildings continued to pursue all nine causes of action against Appellants, but WSP Administration no longer pursued six of those causes of action. It pursued only three causes of action against Appellants: unjust enrichment, breach of loyalty, and breach of fiduciary duty. As a result, WSP Administration effectively nonsuited its statutory claims against Appellants for violations of TUTSA and TUFTA and its common law claims for tortious interference, unjust enrichment, and

16

civil conspiracy. *See FKM P'ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 632 (Tex. 2008) ("In civil causes generally, filing an amended petition that does not include a cause of action effectively nonsuits or voluntarily dismisses the omitted claims as of the time the pleading is filed.").

While a plaintiff has an absolute right to nonsuit a claim before resting its case-in-chief, a nonsuit "shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief." *Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *13 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.) (citing TEX. R. CIV. P. 162; *CTL/Thompson Tex., LLC v. Starwood Homeowner's Ass'n, Inc.*, 390 S.W.3d 299, 300 (Tex. 2013)). A motion to dismiss that affords more relief than a nonsuit provides constitutes a claim for affirmative relief, which survives nonsuit. *Id.* at *14 (citing *Rauhauser v. McGibney*, 508 S.W.3d 377, 381 (Tex. App.—Fort Worth 2014, no pet.), *overruled on other grounds by Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017)). "TCPA motions to dismiss survive nonsuit because, unlike a nonsuit, the TCPA motion to dismiss might also allow the movant to obtain a dismissal with prejudice, attorney's fees, and sanctions." *Id.*; *see Walker v. Hartman*, 516 S.W.3d 71, 80 (Tex. App.—Beaumont 2017, pet. denied) (recognizing that TCPA motion to dismiss survives nonsuit).

Here, Appellants' TCPA motion to dismiss, based on the First Amended Petition, constitutes an affirmative request for relief. Appellants not only requested dismissal of all WSP's claims asserted in the First Amended Petition, but they also requested the affirmative relief of "attorneys' fees, expenses and costs associated with defending against [the claims asserted in the First Amended Petition]." Neither WSP's amending of its petition nor the nonsuiting of certain claims can operate to divest Appellants of their right to affirmative relief. *See Abatecola*, 2018 WL 3118601, at *14. Thus, Appellants' TCPA motion to dismiss was not rendered moot by the filing of the Second Amended Petition. *Cf. id.* (holding that portion of TCPA motion asserted by two defendants was not rendered moot by plaintiffs' nonsuiting of those defendants).

## Dismissal Under the TCPA

We next determine whether the trial court properly denied Appellants' motion to dismiss under the TCPA. Appellants raise three issues on appeal, challenging the trial court's order.

In their first issue, Appellants question "[w]hether the two-sentence verification to WSP Buildings's and WSP Administration's [second] amended petition satisfied their evidentiary burden in response to Appellants' motion to dismiss." As a subpoint to this issue, Appellants assert that the TCPA applies to WSP's claims. In their second issue, Appellants contend that "the trial court erred in

not awarding attorneys' fees against WSP USA, Inc. after it failed to file a response to Appellants' motion to dismiss." Appellants' third issue questions "[w]hether WSP Buildings and WSP Administration presented clear and specific evidence sufficient to state a prima facie case as to each of [their] claims."

## A.    TCPA Statutory Framework

The TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015). We construe the TCPA "liberally to effectuate its purpose and intent fully." *See* TEX. CIV. PRAC. & REM. CODE § 27.011(b); *see State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018). The stated purpose of the act "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002.

To effectuate the statute's purpose, the TCPA provides a three-step decisional process to determine whether a lawsuit or claim should be dismissed under the statute. *Creative Oil & Gas, LLC v. Lona Hills Ranch*, *LLC*, No. 18-0656, 2019 WL 6971659, at *3 (Tex. Dec. 20, 2019); *see also* FORMER TEX. CIV. PRAC. & REM.

CODE ANN. §§ 27.003 ("Motion to Dismiss"), .005 ("Ruling").[7] The TCPA requires that a trial court deciding a motion to dismiss "shall consider the pleadings and supporting and opposing affidavits" filed by the parties. *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.006(a).

Under the first step, a movant must show by a preponderance of the evidence that the TCPA applies. *See id.* § 27.005(b). The TCPA applies if the non-movant's "legal action"—defined as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief"—is based on, relates to, or is in response to the movant's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association. *Id.*; *In re Lipsky*, 460 S.W.3d at 586–87.

If the first step is met—that is, the movant shows that the TCPA applies—then the burden shifts to the non-movant under the second step to establish by "clear and specific evidence a prima facie case for each essential element" of his claim. FORMER TEX. CIV. PRAC. & REM. CODE § 27.005(c); *In re Lipsky*, 460 S.W.3d at 587. If the movant meets the first step, but the non-movant does not meet the required showing of a prima facie case, the trial court must dismiss the non-movant's claim. *See* FORMER CIV. PRAC. & REM. CODE § 27.005. Under the third step, even if the

---

[7] As mentioned, citation to the pre-amendment version of a TCPA section amended in 2019 will be identified as the "Former" section.

non-movant satisfies the second step, the court will nonetheless dismiss the claim if the movant "'establishes by a preponderance of the evidence each essential element of a valid defense' to the [non-movant's] claim." FORMER TEX. CIV. PRAC. & REM. CODE § 27.005(d)).

If the trial court dismisses the legal action under the TCPA, the court "shall award" to the moving party:

(1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and

(2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

*Id*. § 27.009(a).

A non-movant can avoid the TCPA's burden-shifting requirements by showing that one of the act's several exemptions applies. *See id.* § 27.010. For instance, as asserted in this case, the commercial-speech exemption removes certain commercial speech from the TCPA's protections. *See id.* § 27.010(b).

## B.    Standard of Review

We review de novo the denial of a TCPA motion to dismiss. *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). In making this determination, the court views the pleadings and evidence in a light most favorable to the plaintiff

21

non-movant. *Schimmel v. McGregor*, 438 S.W.3d 847, 855–56 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Whether the TCPA applies to WSP's claims is an issue of statutory interpretation that we also review de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). In conducting our analysis, "we ascertain and give effect to the Legislature's intent as expressed in the language of the statute." *Harper*, 562 S.W.3d at 1. We construe the statute's words according to their plain and common meaning, "unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results." *Youngkin*, 546 S.W.3d at 680.

We are required to consider both the specific statutory language at issue and the statute as a whole. *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) (orig. proceeding); *see Youngkin*, 546 S.W.3d at 680 ("[L]egislative intent derives from an act as a whole rather than from isolated portions of it."). We endeavor to read the statute contextually, giving effect to every word, clause, and sentence. *In re Office of Att'y Gen.*, 422 S.W.3d at 629.

## C. TCPA's Application to WSP's Claims

To obtain dismissal under the TCPA, Appellants had the initial burden to demonstrate that the TCPA applied to WSP's claims. This burden required Appellants to demonstrate by a preponderance of the evidence that (1) WSP's "legal

action"[8] (2) "is based on, relates to, or is in response to" (3) an exercise of the right of free speech or the exercise of the right of association.[9] *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.005(b). Appellants contend in their first issue that they met this burden.

### 1. Right of Association

In their motion to dismiss, Appellants claimed that WSP's "lawsuit is based on [Appellants'] exercise of the right of free association under the TCPA." At the time the suit was filed, the TCPA defined the "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2). To satisfy the right-of-association prong, Appellants asserted that the lawsuit was "based on [Appellants'] communications in the formation, promotion, and pursuit of their common interest—Infinity—and involve[d] alleged communications among [Appellants]" through which they misappropriated, shared, and used WSP's trade secrets and conspired to misappropriate the trade secrets, breach their fiduciary duties to WSP, and tortiously interfere with WSP's business relationships.

### a. Right-of-association cases involving similar allegations

---

[8]     No one disputes that WSP's claims, seeking damages and injunctive relief, constitute a "legal action," a term defined to include "a cause of action." FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(6).

[9]     The right of petition is not involved in this case.

When presented with allegations like those made here, involving misappropriation of trade secrets and conspiracy, courts have split on whether the TCPA's right of association applies to protect the alleged tortfeasors' conduct. The Third, Twelfth, and Fourteenth Courts of Appeals have held that the TCPA's right of association protects alleged conduct by tortfeasors accused of sharing and using misappropriated trade secrets or conspiring together to advance tortious conduct in furtherance of their own business interests. *See Morgan v. Clements Fluids S. Tex., Ltd.*, 589 S.W.3d 177, 184–86 (Tex. App.—Tyler 2018, no pet.); *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 881 (Tex. App.—Austin 2018, pet. filed); *Abatecola*, 2018 WL 3118601, at *8; *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 296–97 (Tex. App.—Austin 2018, pet. filed); *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 205 (Tex. App.—Austin 2017, pet. dism'd). In these cases, the courts focused on whether the complained-of conduct constituted a TCPA "communication," which "includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX. CIV. PRAC. & REM. CODE § 27.001(1); *see Elite Auto Body*, 520 S.W.3d at 197 (stating that "[t]he linchpin" of "exercise of the right of association . . . is a 'communication'"); *see Morgan*, 589 S.W.3d at 184–85; *Grant*, 556 S.W.3d at 881; *Craig*, 550 S.W.3d at 294. After determining that the complained-of conduct was a "communication," these courts concluded that the conduct was an exercise of

the right of association, statutorily defined as a "communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *See Morgan*, 589 S.W.3d at 185; *Grant*, 556 S.W.3d at 881; *Abatecola*, 2018 WL 3118601, at *8; *Craig*, 550 S.W.3d at 294; *Elite Auto Body*, 520 S.W.3d at 205. The courts indicated—without in-depth discussion—that the "common interests" element of the exercise of the right of association was satisfied by the private business interests being advanced through the tortfeasors' tortious conduct. *See Morgan*, 589 S.W.3d at 185; *Grant*, 556 S.W.3d at 881; *Abatecola*, 2018 WL 3118601, at *8; *Craig*, 550 S.W.3d at 294; *Elite Auto Body*, 520 S.W.3d at 205.

In contrast, the Fifth Court of Appeals, in *Dyer v. Medoc Health Services, LLC*, held that allegations of conspiring and colluding (1) to misappropriate trade secrets, (2) to interfere with business relationships, and (3) to breach fiduciary duties did not trigger the protections of the right of association. 573 S.W.3d 418, 427 (Tex. App.—Dallas 2019, pet. denied). In reaching a different result than the Third, Twelfth, and Fourteenth Courts of Appeals, the *Dyer* court also focused on the meaning of the term "communication."

The *Dyer* court adopted its prior analysis in *ExxonMobil Pipeline Co. v. Coleman* regarding what conduct constitutes an exercise of the right of association. *Id.* (citing *Coleman*, 464 S.W.3d 841, 847 (Tex. App.—Dallas 2015) (*Coleman I*), *rev'd on other grounds*, 512 S.W.3d 895, 899 (Tex. 2017) (*Coleman II*)). In *Coleman*

25

*I*, the court interpreted the TCPA's definition of "exercise of the right of association" in light of the purpose of the statute and determined that "it would be illogical for the [TCPA] to apply to situations in which there is no element of public participation." *Id*. The *Coleman I* court concluded that to "constitute an exercise of the right of association under the [TCPA], the nature of the 'communication between individuals who join together' must involve public or citizen's participation."[10] *Coleman I*, 464 S.W.3d at 848.

The *Dyer* court adopted *Coleman I*'s conclusion, requiring public or citizen participation before a communication received protection under the right of association. The court determined that it would be "illogical" to apply the TCPA to communications involving an alleged conspiracy to misappropriate trade secrets. *Dyer*, 573 S.W.3d at 426 (citing *Coleman I*, 464 S.W.3d at 847). The court concluded that "construing the statute such that appellants would have a 'right of association' based solely on [tortfeasors'] private communications allegedly pertaining to the misappropriation of [trade secrets] is an absurd result that would not further the

---

[10] The *Coleman I* court held that the communications at issue there were not made in the exercise of the right of free speech or in the exercise of the right association as defined by the TCPA. 464 S.W.3d at 845–46. The Supreme Court of Texas reversed the *Coleman I* court's judgment on the ground that the communications, although private, related to a matter of public concern and, thus, constituted the exercise of the right of free speech under the TCPA. *Coleman II*, 512 S.W.3d at 901–01. The supreme court "express[ed] no opinion on whether the challenged communications were made in the exercise of the right of association under the TCPA." *Id.* at 902.

purpose of the TCPA to curb strategic lawsuits against public participation." *Id.* at 426–27 (citing *Youngkin*, 546 S.W.3d at 681; *Coleman I*, 464 S.W.3d at 848).

In *Kawcak v. Antero Resources Corporation*, the Second Court of Appeals also determined that, by conspiring to commit a tortious act against another party for personal financial gain, the alleged tortfeasors had not exercised their right of association. 582 S.W.3d 566, 569 (Tex. App.—Fort Worth 2019, pet. denied). The court did not focus on whether the alleged tortious conduct constituted a "communication"; instead, the court focused on the phrase "common interests" found in the definition of "exercise of the right of association." *Id.*; *see* FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(2).

The *Kawcak* court discussed several dictionary definitions of the word "common" in the context of the TCPA's stated purpose. *Id.* at 575–79. The court found *Webster*'s definition of "common" to be the most suitable, defining "common" as "of or relating to a community at large," "known to the community," or "belonging to or typical of all mankind." *Id.* at 576 (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 458 (2002)). The court stated, "*Webster*'s definition of 'common' supports a plain meaning of the word that embraces interests broader than the narrow interest shared by two people who engage in a conspiracy where one conspirator allegedly breaches his fiduciary duty to profit himself and his co-conspirator." *Id.* at 576. The *Kawcak* court held that, because "the plain meaning of the word 'common'

27

in TCPA section 27.001(2)'s definition of 'the right of association' requires more than two tortfeasors conspiring to act tortiously for their own selfish benefit," the TCPA did not apply to the claims in that case. *Id.* at 588. Because only two tortfeasors were involved in *Kawcak*, the court held their alleged conduct was not protected by the right of association. *Id.*

### b. Defining "common interests"

To determine whether a plaintiff's allegations implicate a party's exercise of his right of association, we agree with the *Kawcak* court that it is necessary to determine what definition the legislature intended to ascribe to the word "common" in the phrase "common interests." *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(2) (defining "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests"). *Kawcak* held that "common" in TCPA section 27.001(2)'s definition of "the right of association" requires more than two tortfeasors conspiring to act tortiously for their own selfish benefit. *Kawcak* left unanswered whether allegations of three or more tortfeasors acting together (as here) for their own benefit fits the definition of "common." *See Kawcak*, 582 S.W.3d at 588.

Because the TCPA does not define the word "common," we give it its ordinary meaning. *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.

28

2011). "We often look to dictionary definitions to shed light on the ordinary meaning of a statutory term." *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 60 (Tex. 2019).

The word "common" has a variety of meanings. These meanings include: (1) "of or relating to a community at large: public"; (2) "belonging to or shared by two or more individuals or things or by all members of a group"; (3) "occurring or appearing frequently: familiar"; (4) "widespread, general"; and (5) "falling below ordinary standards: second-rate." *Common*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/common (last visited Feb. 12, 2020) (capitalization omitted); *see Common*, WEBSTER'S NEW COLLEGIATE DICTIONARY (1981) (providing similar definitions for "common").

Appellants assert that they exercised their right of association in furtherance of their common interests, which they identify as their new business venture, Infinity. The second definition (above) of "common" fits Appellants' use of the word, that is, "belonging to or shared by two or more individuals or things or by all members of a group." But we cannot agree that this was the meaning of "common" intended by the Legislature when it enacted the TCPA.

"We will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013). If an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme

29

as a whole. *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015); *see Combs*, 340 S.W.3d at 441 ("It is a fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used."). Here, the first meaning of common—"of or relating to a community at large: public"—is the closest to the intended meaning of the term when considered in the context of the TCPA's statutory scheme.

Defining "common" to include a public component is in line with the TCPA's statutory scheme because it corresponds to the express purpose of the TCPA to protect constitutional rights, while at the same time protecting the rights of persons to file meritorious lawsuits for demonstrable injury. *See* TEX. CIV. PRAC. & REM. CODE § 27.002. Requiring a public component also harmonizes the definition with the other two exercises of rights—right of free speech and right to petition—defined in the TCPA, which both "have some public component." *Kawcak*, 582 S.W.3d at 579. The "exercise of the right to free speech" requires a "communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). And the "exercise of the right to petition" requires a communication that pertains to governmental or at a minimum, public, proceedings. *Id.* § 27.001(4). It would be "incongruous to conclude" that the word "common," as used in the

definition of exercise of the right of association, does not require a public component. *Kawcak*, 582 S.W.3d at 579.

Finally, the recent amendments to the TCPA also support defining "common" to mean "of or relating to a community at large: public." In 2019, the Texas Legislature passed House Bill 2730, amending numerous TCPA provisions and providing clarification for its application. Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12, 2019 TEX. SESS. LAW SERV. 684 (current version TEX. CIV. PRAC. & REM. CODE §§ 27.001–27.011). A bill analysis, prepared by the Senate Research Center, provides insight into the reasons behind the 2019 amendments:

> Certain statutory provisions relating to expedited dismissal procedures for lawsuits involving the exercise of free speech, the right of association, and the right to petition lend themselves to unexpected applications because they are overly broad or unclear. H.B. 2730 seeks to remedy this issue by clarifying the scope and applicability of those provisions.

Senate Research Ctr., Bill Analysis, Tex. H.B. 2730, 86th Leg., R.S. (2019).

Among the provisions the Legislature remedied "by clarifying the scope and applicability" was the definition of "exercise of right of association." The amended definition provides that "exercise of the right of association" "means to join together to collectively express, promote, pursue, or defend *common interests relating to a governmental proceeding or a matter of public concern*." Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, sec. 27.001(2), 2019 TEX. SESS. LAW SERV. 684, 684 (emphasis added). In other words, to constitute an exercise of the right of association

31

under the 2019 amendments, the object or purpose of the protected conduct must relate to a governmental proceeding or a matter of public concern. *See id.* The 2019 amendments define "matter of public concern" as "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, sec. 27.001(7), 2019 TEX. SESS. LAW SERV. 684, 685.

We acknowledge that the amended definition of "exercise of the right of association" does not apply to this suit. *See id.* § 11. But we are mindful that, "[w]hen the meaning of an existing law is uncertain, the Legislature's later interpretation of it is highly persuasive."[11] *Texas Water Comm'n v. Brushy Creek Mun. Util. Dist.*,

---

[11]    This precept is more fully described in *Stanford v. Butler*, 181 S.W.2d 269, 274 (Tex. 1944):

> There is a very well-established rule that where a later act implies a particular construction of an existing law, and particularly where the existing law is ambiguous or its meaning uncertain, interpretation of the prior act by the Legislature as contained in the later act is persuasive when a court is called upon to interpret the prior law. 39 TEX. JUR., p. 239. In the case of *Cannon's Adm'r v. Vaughan*, 12 Tex. 399, this Court said: "It is another established rule that all acts in pari materia are to be taken together, as if they were one law, and that if it can be gathered from a subsequent statute, in pari materia, what meaning the Legislature attached to the words of a former statute, this will amount to a legislative declaration, of its meaning, and will govern the construction of the first statute."

917 S.W.2d 19, 21 (Tex. 1996); *see Calvert v. Marathon Oil Co.*, 389 S.W.2d 153, 158 (Tex. App.—Austin 1965, writ ref'd n.r.e.) (considering amendment to statute in construing statutory language because Legislature's stated purpose in amending statute was to clarify existing law and express original intention of Legislature).

Here, the pre-amendment meaning of "exercise of the right of association" is uncertain. Not only does the bill analysis indicate that the amendments were necessary to clarify "overly broad or unclear" provisions in the TCPA, the caselaw interpreting what conduct constitutes an "exercise of the right of association" reflects the uncertainty of the phrase. As discussed, Texas courts have reached divergent conclusions when tasked with determining whether alleged tortfeasors, by conspiring and colluding with one another to commit torts in furtherance of their own pecuniary interests, had exercised their right of association.

We presume that the Legislature was aware of the conflicting holdings in the caselaw when it enacted the 2019 amendments. *See In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (orig. proceeding) (explaining that courts presume Legislature "is aware of relevant case law when it enacts or modifies statutes"). With this awareness, the Legislature elected to limit the object of the exercise of the right of association to "common interests, relating to a governmental proceeding or a matter of public concern." Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, sec. 27.001(2), 2019 TEX. SESS. LAW SERV. 684, 684 (codified at TEX. CIV. PRAC. & REM. CODE

33

§ 27.001(2)). In amending the statute, the Legislature chose to define "common interests" in a manner most in line with the holdings in *Kawcak* and *Dyer*, which determined that tortfeasors, conspiring and colluding for their own private financial gain, are not entitled to protection under the right of association. *See Dyer*, 573 S.W.3d at 427; *Kawcak*, 582 S.W.3d at 588. By limiting "common interests" to those interests related to government proceedings or matters of public concern (as defined in the amended statute), the Legislature clarified that the exercise of the right of association was never intended to include an alleged tortfeasor's acts taken in furtherance of private interests.

We conclude that, with respect to the pre-amendment version of the TCPA, the proper definition of "common" in the phrase "common interests" is "of or relating to a community at large: public." Here, Appellants assert that the "common interest" that they allegedly "join[ed] together to collectively express, promote, pursue, or defend" was their new business venture, Infinity. *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(2). As pleaded by WSP, Appellants' conduct and communications, involved in misappropriating WSP's trade secrets and conspiring to commit related torts, benefitted only the five alleged tortfeasors. There are no allegations that the tortfeasors "join[ed] together to collectively express, promote, pursue, or defend" any public or community interests. Therefore, we hold that Appellants did not meet their burden of showing, by a preponderance of the

34

evidence, that WSP's suit was based on, relates to, or is in response to an exercise of their right of association. *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.005(b)(3).

## 2. Right of Free Speech

In their motion to dismiss, Appellants also claimed that the lawsuit was based on Appellants' exercise of the right to free speech. The definition of "exercise of the right to free speech" is "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). At the time this suit was filed, a "matter of public concern" included an issue related to health or safety, environmental, economic, or community well-being, the government, a public official or public figure, or a good, product, or service in the marketplace." FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(7)(E).

### a. Communications among the alleged tortfeasors

Appellants assert that the exercise of their free-speech rights was implicated by WSP's allegations that Appellants and the other alleged tortfeasors (Sinz and Infinity) engaged in "communications" with one another. Appellants assert that these communications were comprised of the tortfeasors' alleged conduct of misappropriating, sharing, and using WSP's trade secrets and conspiring with one another in furtherance of their tortious actions. Appellants claim that these alleged

"communications" were made "in connection with a matter of public concern" because they related to "a good, product, or service in the marketplace." *Id.*

Contrary to Appellants' reading of the statute, "not every communication related somehow to one of the broad categories set out in section 27.001(7) always regards a matter of public concern." *Creative Oil & Gas*, 2019 WL 6971659, at *7. "The words 'good, product, or service in the marketplace' . . . do not paradoxically enlarge the concept of 'matters of public concern' to include matters of purely private concern." *Id.* at *5. "[T]he 'in the marketplace' modifier suggests that the communication must have some relevance to a public audience of potential buyers or sellers." *Id.* Although the Supreme Court of Texas has "previously held that private communications are sometimes covered by the TCPA[,] . . . [t]hese prior cases involved environmental, health, or safety concerns that had public relevance beyond the pecuniary interests of the private parties involved." *Id.* at *7 (citing *Coleman II*, 512 S.W.3d at 898, 901; *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509–10 (Tex. 2015).

Here, the internal communications among the Appellants and the other tortfeasors—through which they allegedly misappropriated, shared, and used WSP's trade secrets, breached their fiduciary duties, and conspired to further their business venture—had no potential impact on the wider community or a public audience of potential buyers or sellers. In short, the communications had no public relevance

36

beyond the pecuniary interests of the private parties. *See id.* (explaining that private "dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words"). Because they did not meet their burden of showing that their internal communications were "made in connection with a matter of public concern," we hold that Appellants did not meet their burden of showing, by a preponderance of the evidence, that WSP's suit was based on, relates to, or is in response to an exercise of their right of free speech regarding those communications. *See id.*; *see also* FORMER TEX. CIV. PRAC. & REM. CODE § 27.005(b)(1).

### b. Communications to parties outside the tortfeasor group

Appellants also claim that their right of free speech was implicated by alleged communications they made to parties outside the tortfeasor group.

### i. Allegations in the First Amended Petition

To support their TCPA motion to dismiss, Appellants relied on WSP's First Amended Petition. In their motion, Appellants asserted that WSP alleged in the First Amended Petition that Appellants had posted information regarding WSP's projects on Infinity's website. Regardless of whether this conduct constituted an exercise of their free-speech rights, the First Amended Petition did not allege that Appellants had posted the information on Infinity's website. Rather, the pleading alleged that Infinity and Sinz had posted the information.

37

Relatedly, to show an exercise of their right of free speech, Appellants asserted in their motion that, "in [WSP's] claim for tortious interference with existing contract, [WSP] allege[d] Defendants interfered with contracts by 'inducing or attempting to induce WSP's existing clients to reduce their business relationship with WSP.'" However, the only specific factual allegations in the First Amended Petition possibly related to tortious interference with existing contracts pertain to the actions of Infinity and Sinz. WSP alleged that Infinity posted information about WSP's projects on its website and alleged that Sinz had "publicly used" WSP's proprietary information to advertise the projects as Infinity's experience "ostensibly to attract clients" but does not implicate Appellants in this conduct.

We note that the First Amended Petition mentions that Sinz and Appellants engaged in "off-book projects." However, the pleading does not provide any additional information from which it can be determined whether the conduct involved communications protected by Appellants' right of free speech. *See Rossa v. Mahaffey*, No. 11-18-00347-CV, 2019 WL 5800283, at \*6 (Tex. App.—Eastland Nov. 7, 2019, no pet.) (determining that, because plaintiff's petition did not "contain any specific allegations about when, where, and to whom the allegedly defamatory statements were made," the petition, viewed "holistically," "[did] not demonstrate that the defamation claim [fell] within the TCPA"); *Staff Care, Inc. v. Eskridge Enters.*, No. 05-18-00732-CV, 2019 WL 2121116, at \*5 n.3 (Tex. App.—Dallas

May 15, 2019, no pet.) (mem. op.) (concluding that, without knowing content of communication, "a court cannot determine whether the alleged communication falls under the statutory definitions of the TCPA").

Appellants further cited WSP's request for injunctive relief as evidence that WSP's claims were based on Appellants' exercise of their freedom of speech. Specifically, Appellants pointed to WSP's request that all defendants be prohibited "from disclosing or using [WSP's] alleged confidential information or proprietary information" and from identifying WSP's projects in Infinity's marketing materials or on its website. Because it pertains to possible future conduct, rather than past conduct, the requested relief did not demonstrate an exercise of Appellants' right of free speech.

We conclude that Appellants did not demonstrate in their motion to dismiss that the claims asserted in the First Amended Petition were based on, related to, or in response to Appellants' exercise of their free-speech rights. Because the First Amended Petition was the last pleading in which WSP USA was a plaintiff, the inquiry ended regarding the applicability of the TCPA to WSP USA's claims.

### ii. Allegations in the Second Amended Petition

After Appellants filed their motion to dismiss, WSP Administration and WSP Buildings (but not WSP USA) filed a response to Appellants' motion to dismiss. That same day, WSP Administration and WSP Buildings filed their verified Second

39

Amended Petition, which they offered to support their response. The Second Amended Petition contained additional, specific allegations not made in the First Amended Petition. Among these were allegations that (1) Appellants had submitted a proposal for, and were awarded, an "off the books" project—the ME Global project—from Kirksey Architecture and (2) Appellants had sent advertising brochures to WSP's clients on behalf of Infinity.

Appellants claim that these specific allegations demonstrate that WSP Administration's and WSP Buildings's claims related to Appellants' exercise of their free-speech rights. Appellants contend that the alleged conduct—soliciting and procuring the ME Global project and sending advertising brochures—were "communications" made "in connection with a matter of public concern" because the communications related to "a good, product, or service in the marketplace." *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.001(7)(E).

**ME Global Project.** WSP Administration and WSP Buildings alleged that, while still employed by WSP Administration, Appellants bid on the ME Global project without WSP's knowledge by sending a proposal to Kirksey Architecture. In making the bid, they represented themselves as WSP employees bidding on behalf of WSP. Kirksey ostensibly awarded the ME Global project to WSP; however, Appellants never informed WSP about the project, keeping it "off the books." The Second Amended Petition alleged that Appellants worked on the project using WSP

40

resources, including WSP Buildings's trade secret and confidential information, but never informed WSP of the project or recorded the WSP resources used on the project. WSP was ultimately paid for work on the project done by Appellants, but the remainder of the project was awarded to another company. WSP later learned information indicating that Appellants continued to work on the ME Global project after joining Infinity.

In their TCPA response, WSP Administration and WSP Buildings claimed that the commercial-speech exemption applied to remove Appellants' alleged conduct related to the ME Global project from the TCPA's protection. Appellants replied, asserting that WSP Administration and WSP Buildings did not meet their burden to prove application of the commercial-speech exemption.

We need not determine whether the commercial-speech exemption applied to alleged communications involved in the ME Global project because the communications were not an exercise of Appellants' free-speech rights. Specifically, the communications were not made "in connection with a matter of public concern" because they were not related to "a good, product, or service in the marketplace." *Id.*; *see Creative Oil & Gas*, 2019 WL 6971659, at *7.

Any communications by Appellants to Kirksey in soliciting and procuring the ME Global project do not have relevance to a public audience of buyers or sellers but instead were limited to "the pecuniary interests of the private parties involved."

41

*Creative Oil & Gas*, 2019 WL 6971659, at \*7. The allegations relating to the ME Global project are "simply not a 'matter of public concern' under any tenable understanding of those words." *Id.* Therefore, Appellants' conduct relating to the ME Global project was not an exercise of their free-speech rights. *See id.*

**Advertising Brochures.** The Second Amended Petition also alleged that Appellants sent advertising brochures to WSP's clients, leading WSP's clients to ask whether the rumor was true that WSP's Houston office was closing. Assuming without deciding that Appellants' conduct of sending advertising brochures to WSP's clients was an exercise of their free-speech rights, the conduct is excluded from the TCPA's protection under the commercial-speech exemption.

> The commercial-speech exemption provides that the TCPA
>
> does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

FORMER TEX. CIV. PRAC. & REM. CODE § 27.010(b). The Supreme Court of Texas has determined that the commercial-speech exemption applies when the following four elements are shown:

> (1) the defendant was primarily engaged in the business of selling or leasing goods [or services],

(2) the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services,

(3) the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides, and

(4) the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018).

The party asserting the commercial-speech exemption has the burden to prove its application. *Schimmel*, 438 S.W.3d at 857. When determining whether a party has met its burden, we consider the pleadings and record evidence. *See* FORMER TEX. CIV. PRAC. & REM. CODE § 27.006(a).

Appellants contend that WSP Administration and WSP Buildings needed to offer more than their verified pleadings to prove application of the commercial-speech exemption. We disagree.

The nature of the legal action is revealed by the factual allegations in the pleadings. *See Hersh*, 526 S.W.3d at 467 (observing that court has often said that plaintiff's petition is "the best and all-sufficient evidence of the nature of the action" to show TCPA applies to plaintiff's claims). It follows that the factual allegations contained in the pleadings may alone be sufficient to demonstrate that the nature of the claims is such that the claims are statutorily exempt without need of additional

43

proof. *See Hawkins v. Fox Corp. Hous., LLC*, No. 01-19-00394-CV, 2020 WL 425121, at *3 (Tex. App.—Houston [1st Dist.] Jan. 28, 2020, no pet. h.) ("We may rely on the factual allegations in a plaintiff's petition, alone, to meet the [*Castleman*] elements."); *Rose v. Scientific Mach. & Welding, Inc.*, No. 03-18-00721-CV, 2019 WL 2588512, at *4 (Tex. App.—Austin June 25, 2019, no pet.) (mem. op.) (stating factual allegations in plaintiff's petition may alone demonstrate exemption); *see also The Pinkerton Law Firm, PLLC v. Univ. Cancer Ctr.*, No. 01-19-00089-CV, 2020 WL 97173, at *3–*4 (Tex. App.—Houston [1st Dist.] Jan. 9, 2020, no pet. h.) (analyzing allegations in live pleading to determine application of commercial-speech exemption); *Giri v. Estep*, No. 03-17-00759-CV, 2018 WL 2074652, at *4 (Tex. App.—Austin May 4, 2018, pet. denied) (mem. op.) (relying on live petition to determine whether first *Castleman* element was satisfied); *Dickens v. Jason C. Webster, P.C.*, No. 05-17-00423-CV, 2018 WL 6839568, at *7 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.) (determining whether commercial-speech exemption applies by examining plaintiff's petition); *Grant*, 556 S.W.3d at 889 (stating that, to determine whether claims fall within the commercial-speech exemption, court examined "'evidence,'" which, there, "consist[ed] of the plaintiffs' pleadings").

With these principles in mind, we apply the *Castleman* elements.

Regarding the first *Castleman* element, the pleadings show that Appellants were primarily engaged in the business of selling or leasing goods or services. *See Castleman*, 546 S.W.3d at 688. The First and Second Amended Petitions alleged that Infinity is "a provider of mechanical, electrical, plumbing, fire protection, commissioning, and low voltage/security/IT services, which are the very same services provided by WSP." The pleadings identify Miller as Infinity's principal, Gaskamp as Infinity's associate principal, and Hunter as its employee.

"Notably, the exemption's plain text requires the defendant to be primarily engaged in *the business* of selling goods or services, not primarily engaged in the act of *selling*." *Rose*, 2019 WL 2588512, at *4. Based on their respective positions with the company, it is reasonable to conclude that Appellants were "primarily engaged" in Infinity's business of providing "mechanical, electrical, plumbing, fire protection, commissioning, and low voltage/security/IT services." *See Hieber v. Percheron Holdings, LLC*, No. 14-19-00505-CV, 2019 WL 6001153, at *4 (Tex. App.—Houston [14th Dist.] Nov. 14, 2019, pet. filed) ("[T]he exemption can apply even though the movant is just an employee."); *Rose*, 2019 WL 2588512, at *5 (concluding that "high-level executive of a company that primarily designs and sells manufactured items to customers is also 'primarily engaged' in that type of business").

The second *Castleman* element requires that Appellants engaged in the complained-of conduct in their capacity as sellers of Infinity's services. *Castleman*, 546 S.W.3d at 688. To determine whether Appellants engaged in the conduct in this capacity, we consider the context in which the conduct was performed. *See Rose*, 2019 WL 2588512, at *4 (considering context in which statements were made to determine if defendant made them in capacity as seller). The Second Amended Petition alleged that Appellants sent advertising brochures to WSP's clients while working for Infinity, WSP's competitor. The petition implies that the advertising brochures generated a rumor that WSP's Houston office was closing. Because the allegations complain about conduct in the context of furthering Infinity's business for the purpose of securing sales for Infinity, we conclude that Appellants engaged in the complained-of conduct in their capacity as sellers of Infinity's services. *See id.* at *6 (concluding that second element satisfied because appellant contacted former employer's customers in attempt to solicit sales for his own financial gain); *see also Staff Care*, 2019 WL 2121116, at *8 (noting that in *Castleman*, supreme court "implied the exemption applies when communications involve business pursuits for oneself or a business stands to profit from the statements at issue").

The closely related third *Castleman* element, requiring that the complained-of statement or conduct arise out of a commercial transaction involving the kind of goods or services the defendant provides, is also satisfied. *See Castleman*, 546

S.W.3d at 688, 690; *see also Giri*, 2018 WL 2074652, at *4 (noting requirement that statement or conduct at issue "arose out of" commercial transaction means that it "results, issues, or proceeds" from sale or commercial transaction). Because the conduct targeted WSP's clients with the apparent objective of securing customers for Infinity, the complained-of conduct of sending advertising brochures to WSP's clients also "arose out of a commercial transaction involving the kind of goods or services" that Infinity provides. *See Callison v. C&C Personnel, LLC*, No. 09-19-00014-CV, 2019 WL 3022548, at *6 (Tex. App.—Beaumont July 11, 2019, pet. denied) (mem. op.) ("Utilizing confidential or proprietary information from a previous employer while working for a new employer to target and secure the same customers satisfies this element.").

The last element requires that "the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides." *Castleman*, 546 S.W.3d at 688. By sending advertising brochures to WSP's clients, Appellants were seeking to market Infinity's services (which were alleged to be the same as WSP's services) to potential clients. Therefore, the fourth *Castleman* element is satisfied. We conclude that WSP Administration's and WSP Buildings's claims in the Second Amended Petition, based on Appellants' conduct of sending advertising brochures to WSP's clients, fall within the commercial-speech exemption.

47

## Conclusion

In sum, we conclude that the complained-of communications between Appellants, Sinz, and Infinity—through which they allegedly misappropriated, shared, and used WSP's trade secrets, breached their fiduciary duties, and conspired to further their business venture—are not protected under the TCPA as either an exercise of Appellants' right of association or an exercise of their right of free speech. We also reject Appellants' assertion that they met their burden to show that allegations in the First Amended Petition involved communications to third parties that constitute an exercise of their free-speech rights. The additional allegations, in the Second Amended Petition, regarding Appellants' conduct related to the ME Global project also did not trigger free-speech protections.

We further conclude that, by relying on the pleadings (which is permissible), WSP Buildings and WSP Administration proved that, under the commercial-speech exemption, the TCPA did not apply to Appellants' conduct of sending advertising brochures to WSP's customers. Therefore, we hold that the TCPA does not apply to WSP's claims, and the trial court did not err when it denied Appellants' motion to dismiss. We overrule Appellants' first issue to the extent it asserts that the TCPA applies to WSP's claims and to the extent it challenges the use of only the pleadings to support application of the commercial-speech exemption.

In their second issue, Appellants assert that, because WSP USA did not file a response to Appellants' motion to dismiss, the trial court erred by not awarding Appellants attorneys' fees against WSP USA. Appellants base this assertion on the premise that they met their burden to show that the First Amended Petition (the last pleading in which WSP USA was a plaintiff) contained claims based on, related to, or in response to conduct protected by the TCPA. As discussed, Appellants did not meet this burden, and the burden never shifted to WSP USA to file a response or to prove a prima facia case. *See In re* Lipsky, 460 S.W.3d at 587. Therefore, we overrule Appellants' second issue.

In their third issue and in a portion of their first issue, Appellants assert that WSP Buildings and WSP Administration did not meet their burden to prove a prima facie case as to each of their claims. However, because the TCPA does not apply to any of WSP's claims, the burden never shifted to WSP Buildings and WSP Administration to prove a prima facia case, and we need not address these assertions. *See Sullivan v. Tex. Ethics Comm'n*, 551 S.W.3d 848, 856 n.6 (Tex. App.—Austin 2018, pet. denied) ("Because we hold that the TCPA does not apply, we do not reach the second step in the TCPA analysis of whether [the non-movant] met its burden to prove a prima facie case.").

We affirm the trial court's order denying Appellants' motion to dismiss.

Richard Hightower
Justice

En banc court consists of Chief Justice Radack and Justices Keyes, Lloyd, Kelly, Goodman, Landau, Hightower, and Countiss.